May it please the Court, David Buki on behalf of Hector Zapata, Your Honor. And I know you sent us a letter, but if you could just remind us of how you intend to divide your argument. I would be happy to, Your Honor. I will argue for approximately 12 or 13 minutes, and I will deal with the issues of the overall sufficiency of the evidence, and then talk about the issue that I have raised regarding the introduction of the expert testimony that we believe was flawed, and finally talk about the error that we believe occurred in the reopening of testimony to allow Agent Carpio to testify. My colleagues will take the rest of the opening portion to raise whatever issues they wish to and to respond to questions the Court may have that are individual to their clients in particular. We'd like to reserve roughly five minutes for rebuttal, and we would divide that depending upon how the questioning goes with the Court's permission. That sounds like a perfectly good plan. Thank you, Your Honor. I appreciate the opportunity to address this Court on behalf of Mr. Zapata and the others with respect to sufficiency because we believe that there are some significant issues that are raised here. And I'd like to touch just briefly on it. I'd like to touch on the sufficiency issue in this fashion. No one is suggesting that there was not some sort of agreement between these individuals to obtain drugs and to ship them from one location to another. But the question, the key question that permeates the entire case, was whether the evidence was sufficient to show that my client and others intended that these drugs be distributed within the United States and that they intended to import them to the United States. And the standard by a case that both parties have cited, the direct sales case from 1943, I believe, from the Supreme Court, talks about how the evidence of that kind of intent must be shown by clear and unequivocal evidence. Now, the government has cited a litany of items that they believe support the sufficiency argument. And to their credit, they raise good points. But I think it is helpful before we go there to talk just briefly about what this case did not involve in the proof. It did not involve any actual drugs that ever went anywhere. Now, we know that the government isn't required to establish the presence of drugs in a conspiracy case. But the reason that is important in this case, Your Honor, is that in many cases the pathway of drugs provides concrete evidence of where drugs were intended, so intended to go. That did not exist here because no transaction ever happened. A case that might be contrasted with the present case is, I believe, the Martinez case from the District of Columbia Circuit that, again, that both of us cite. In that case, there was also extraterritorial conduct, also discussion about where drugs were going to go. But the drugs themselves, in fact, were seized in Guatemala on the Pan-American Highway headed for the United States. But here's my problem with your, I won't say necessarily your argument, but with the position that your clients are in. We have evidence that the ship involved was going to be in the Pacific. It was going to come through the canal and be into the Pacific. We have evidence that the code-named coordinates were off the west coast of Mexico. And if drugs are going to be off the west coast of Mexico, I have trouble thinking that a jury would have believed they were headed for Europe. Well, I understand the point that Your Honor makes. I think, first of all, and it's jumping ahead to the next point, the relevance of the points that Your Honor just raised, it only achieved, I think, meaning through the testimony of the experts. I'm always troubled, and the prosecutors did a fine job in this case, and Mr. Blackstone argued, I'm always troubled when a prosecutor gets up and says, here's a piece of evidence and use your common sense. I mean, I think one can say that, but the proof beyond a reasonable doubt by clear and unequivocal evidence on intent, I think, requires more than that in this case. And so I always thought that the prosecution overstated the importance of the map. And the coordinates themselves, again, only became relevant because the experts said, well, these coordinates show that these drugs were going to this organization and this organization always goes to the United States. I don't know whether that answers Your Honor's question. Well, it may be the best answer you can give. Right. And I think the difficulty that I have had in analyzing the sufficiency in this case, quite frankly, is that there are so many pieces of evidence that, in our view, were objectionable on their face, any one of which by itself did not provide the kind of clear, unequivocal evidence that I have seen in the other cases that are cited. To take another example, the government talks about the conversation between Mr. Jimenez and Agent Carpio on December 7th of 2007, the tape-recorded conversation. And I understand the point that they're making, but their position boils down to four or five words by Mr. Jimenez, well, yes, naturally, sure, in response to the agent's statement, I guess everything's coming here. Now, if one looks at that transcript and it's quoted, I think it's cited at page 180 of the excerpt of record, and read it in its entirety, you really see a conversation in which Mr. Carpio is saying, well, what about this, and what about this, and Jimenez is saying, uh-huh, uh-huh, uh-huh, uh-huh. And when finally he raises this issue about what he called a little service that was going to be near my line, referring to a conversation that occurred several months before that was not introduced into evidence, at that point Jimenez says, well, I'm not even sure that that's not the language he uses. He says, I heard something about that from the old man, and he had so many tasks on his mind. That's, in our view, not a great window of convincing proof. If you contrast it with a case that I cited in our brief where there was a similar issue and it had to do with drugs going from Bimini to Miami, there was a tape-recorded conversation that could not have led to any other interpretation than what we have here. So we argue, and I guess the last thing that I would say in response to Your Honor's question on sufficiency is that, in our view, so much of the government's case was dependent upon the expert testimony. And that's what I, with the Court's permission, I'd like to move on to that point. Because without the expert testimony, the testimony about the coordinates themselves would have been irrelevant. Without the expert testimony, a skilled government counsel would not have been able to say in his closing argument, as he did, this was the Beltran organization. Their whole mission in life is to bring drugs to the United States. Now, that's moving from, that's how the case ended. It's helpful to know, though, that before that, until several months before the case, the government was disavowing any connection between this conduct and the Beltrans. There's pre-trial colloquy from the summer before where government counsel says, we don't know, we don't know who the experts or who the organization is. Only then, in October, several months before the trial, the government said, well, we have developments, we have this cable that showed that Mr. Jimenez said that the drugs were intended for the Beltrans. Well, they couldn't introduce that into evidence, as we'll get to later, because it was un-Mirandized. So the government was looking for evidence, and it was only until three weeks before the trial, when everyone was working white-hot on this case, for reasons extraneous to the issues I'm talking about, that the government presented their summaries of evidence and laid out the summary opinions of three, not one, but three experts who they said were going to talk about where these drugs were intended, one of which talked about the Beltran organization. Now, we have stated, and I've said on our brief, and I won't redo it again here, why in our belief, in fact, the evidence I think would clearly show that the testimony that came in stated that these drugs, not some hypothetical situation, not some general practices, but these drugs were intended to go to the Beltrans and that the Beltrans always submitted their drugs to the United States. So that maybe is an incremental shift in theory, but it is a huge shift in theory from the way the government originally went about this case. And I would submit the reason is they understood they didn't have the evidence because they couldn't introduce Mr. Himen as un-Mirandized confession. The rest of the testimony was subject to different interpretation. So here come these experts talking about all of these things. Now, in our view, and I've tried to synthesize this, if you're honored permission, I think in my reply brief, in the summary of our argument at pages one to nine or whatever it may be, I've tried to boil down why we think that there was a synergistic error in the admission of this evidence and also in the admission of the Carpio testimony. And as to the experts, I think it's really two things. One, as I have stated, that the evidence went to specific drug routes and not general practices, and that the evidence went to what this court called in the Mirand case a key element or defense in the case. And that really goes beyond what I have found in other cases. There's a case from the District of Columbia Circuit that allowed testimony of drug routes similar to this, but the court went out of its way to say this was talking about general practices, not specific practices. And one can say, well, this was a hypothetical. But when you have the agent Mandrigal up there and he is talking about specific coordinates and then says this is where these drugs are going, these drugs, that is, in our view, going over the line that this court has drawn in other cases. And it does go to a specific element. One can talk about it in terms of invading the province of the jury. One can talk about it in terms of going to the intent of the defendants. But that's, in our view, where it went. And other cases have said the same thing. I would indicate to Your Honor that I've tried to cite in our brief a number of situations where this court, in particular, but other courts as well, have been, as I see it, troubled with the overuse of expert testimony in different contexts in criminal trials. The drug courier testimony is one example. Well, this isn't a drug courier profile case. We've never said that. But the situation where a case agent is testifying in the dual role of fact witness and expert, and this court has placed limits on that. And all we are saying is that these situations seem to present cases where the court is troubled by the overuse of expert testimony. And I would suggest that the principles that the court applied in those cases would govern here as well. The other part about the expert testimony that I have talked about, and I will not for time constraints go on much more, is that the experts here were allowed to testify to the identity of other co-conspirators. And that is a big leap from general practices. I found this terrorism prosecution, Paracha from New York City, where they said that even in a case with Al-Qaeda, you couldn't use expert testimony to find the identity of co-conspirators. That relied on a case called Daly, I believe, from New York, which had to do with the five families in the organized crime context. And the court only allowed it because they weren't talking about the issues in that case. General practices could come in. So it's troubling to me, in my experience, that expert testimony could come in and say this person is the co-conspirator, and because we know he sends drugs to the United States, therefore these guys intended to as well. I'd like to spend a minute or two on the Carpio issue, which I think for my client is the most serious issue in the case. First of all, the issue was preserved by trial counsel extensively. And so there can't really be any question about that. But in the context of what I've already talked about, to allow the case agent to come in and to testify that he had information that the drugs were going to the Beltran organization is something that could not be cured by a curative instruction, in our view. And other cases have said that. The Reyes case and the Forrester case from the Second Circuit talk about that. The Cruz-Diaz case, which the court relied on, dealt with a situation that the court really, with all respect to his honor, really never grasped. I have to say I am troubled that he testifies that it's going to the Beltran organization. On the other hand, the defense really pressed hard and forced him, because of the constraints he was laboring under, to say he didn't know. And the defense basically asked for that, and then they got it. I am very glad that Your Honor asked that question, because when one looks at the record, Hector Zapata asked no question but called for this response. He did not say, you didn't pursue this lead. He did not say, you didn't know where the drugs were going. In fact, I looked through the record again last night, and I was struck Mr. Zuloff, who represented Jimenez, stated I think two or three questions on this subject, and it had to do actually with the money laundering counts. It had to do with whether he looked to where the source of the money that went to it. So as to Mr. Zapata, he did not cause this problem, and that leads to what should have happened, which is that there should have been a mid-trial severance granted, and he did everything he could to make and preserve that point. And the judge, His Honor, every step of the way said, well, the defense pressed for this. The defense opened the door. It was the defendant's conduct, and Mr. Zapata did not do that. No, I understand. It was unfair and we're troubled. It was the kind of cherry on the ice cream or whatever. That's a bad metaphor, but it was the linchpin, and it really couldn't be ignored. I see my time has more than expired. I'd like to turn it over to other counsel, and we'll reserve whatever is left for rebuttal. Thank you, Your Honor. Good morning, Your Honor. Robert Lean appearing on behalf of Mr. Rioscos. To answer the Court's question, it seems obvious from the Court's question and common sense that if you're shipping drugs to off the coast of Mexico, the southwest coast of Mexico, that the effect of that agreement is that the drugs are going to make it into the United States. But the crime is called conspiracy, and you have to focus on the nature of the agreement and what were the agreement of the defendants, not what was the thought in Agent Carpio's mind, because he's not a conspirator, and not what Thiebaud or Mr. Schall thought, because he, too, cannot legally be a conspirator. So our position was that the agreement that the three defendants entered into and the other defendants who didn't appear in court was to provide a marine transport agreement to transport drugs from Ecuador, the waters of Ecuador, to the waters or off the, whether they were the territorial waters or the sphere of influence or however Mexico would deem it, 50 to 80 miles off the coast of Mexico, and that's where the drugs would go. And that was their concern. That was, if that happened, they were successful. They were rewarded. The payment part of it had, they had done everything they had to do. So our theory was that that was the conspiracy. And to allow other evidence in to say, well, but this is what we think would have happened next, was error. And it was also insufficient. When there was no contact with the United States, no conspirator of the defendants was in the United States, had any contact with the United States. They were in other countries, other territorial waters. So that was our position to the court's question. As it relates to the ER-410 issue, which is an odd question to come up, but Mr. Riascos gave a series of interviews where he talked about, in connection with his 2001 conviction, that drugs had come either from Costa Rica, Latin America, or Mexico into the United States. To allow that to come in, without him taking the stand, I believed, or argued to the judge, violated ER-410 and Rule 11, as it was constituted at the time that the agreement was entered into. And that was in the brief. And finally, the last question that I had with Mr. Riascos was whether or not he ever was on supervised release, by the nature of the fact that he had never signed any agreement, he had never been told the terms of his supervised release. So I wanted to add those in addition to the arguments that Mr. Buki made on sufficiency. Okay. Good morning, Your Honors. Gregory Lincoln. I represent Miguel Jimenez. And I want to point, address one point, or one issue that arises out of the testimony primarily of Agent Carpio, and that's the voluntariness of that statement. I think if we just highlight three points, that the agent exploited the very real sense of danger that existed. He highlighted that. He himself was afraid of it. He made an offer of protection, and he got a statement. And I think it's telling that Agent Carpio himself said that, you know, it was the absence of armed guards that made it particularly dangerous, because he understood he was in Cali. He understood, as he himself said, that the Riascos owned that town. And it was the absence of guns, it was the absence of those guards to protect them that made the situation particularly dangerous. And he highlighted that fact for Mr. Jimenez to point out how dangerous that scenario was for him and his family. He made an offer of protection. Mr. Jimenez only then gives that statement. I think the district court erred in deeming that statement voluntary. And I think that's the first piece of what then becomes this sort of chain of events where it's admitted, and it's admitted improperly against the other defendants as well. Well, you know probably better than I do that voluntary in this setting is a term of art. It truly is. And I think if there's anything to be taken away from this is that it's not that box-taking exercise. And so the absence of a gun, the fact that it's not a police station in the typical setting, I think those are a distraction in this case. Because if we look at the totality of circumstances, the context of it, it's clear that there was very real danger that was exploited as a means of getting that statement. And that's why we suggest it's involuntary. Thank you. Okay. Thank you. Let's hear from the government. And we will give you, I mean, there are 38 seconds left. We'll give you ample time to respond. Yeah. Good morning, Your Honors. May it please the Court. My name is Michael Morgan. I represent the United States in this appeal. Well, I suppose I should begin at the beginning, which is whether or not there was sufficient evidence to support these convictions. And the government's position is that definitively there was. Especially when we view the evidence not as perhaps the defense would like the Court to view it, but as any rational trier of fact could view it. And as any rational trier of fact could view Mr. Jimenez's statements, that statement could certainly be viewed rationally as an acknowledgement by one of the co-conspirators of knowledge gained by talking to the head of the Riascos group that these drugs were headed to the United States. That piece of evidence alone would have been sufficient to convict not only Mr. Jimenez, but the other defendants as well. For the simple reason that a jury could rationally infer that if someone who was not even part of the organization, who was basically an independent contractor, knew the ultimate destination of these drugs, so too did the two lieutenants who were present at the meetings that Mr. Jimenez had with the head of the organization. So even excluding the expert testimony, there was on the basis of that statement alone legally sufficient evidence. But the government didn't rely simply on that. The government relied primarily, I would argue, on simply the nature of the transactions. Let me ask you something. If I know just from my general knowledge that the drugs were going to the United States, that's probably what's going to happen. Does that make me a conspirator in taking them to the United States? Well, I think if you just... Suppose they're set on fire. Suppose the organization gets them and does something else with them. Do I care? Well, in this particular case, you do care. Well, you're shifting to something else. I'm just talking in general. If I know they're going there, but I don't care. For example, don't argue me what the facts are. Just come into my strange world. Suppose, as a matter of fact, the organization we're going to is going to pay me all the cash for the drugs up front. Period. Don't tell me it doesn't happen usually. I'm just going to say it's going to happen. Now, let's suppose that's true. And so I'm selling them to the X organization, paying me for cash. I don't care what they do with them. Are you saying the fact that Jimenez... Sure. I know they're going to go to the United States. That's what these people do with things. Is that enough to prove your case? Well, if Jimenez said... Without the fronting. Without the fronting. If Jimenez said, I know just on my general knowledge, perhaps not. But if Jimenez says, I know based on my discussions with the head of the group I'm working for, then yes. Why? I mean, if I'm selling drugs to street dealers and I don't care what they do with them, I'm not fronting... Well... Wait a minute. I don't care what they do with them. I know they're going to sell them to somebody else. I'm not in a conspiracy with those street dealers, am I? Well, I suppose if you're trying to analogize to the wholesaler who sells to someone and gets paid and then is sort of like doesn't care, then I think that's probably correct. And I would argue... That's why I said assume it's not fronted, et cetera, et cetera, et cetera. You just said, well, if they knew that that's what's going to happen, then they're guilty. Well, see, I think... Do you want to go that far? I don't want to go that far. I don't need to go that far in this case. Well... Because I think that the... Yeah, that's what I'm asking. Well, but I think the problem... I accept Your Honor's point, but I think the problem here is that Jimenez wasn't basing this just on his own I know where drugs go. It's he's basing it on at least the jury can infer he's basing it on his discussions with the head of the organization about where the ultimate destination of these drugs are for. That's why I said so what? Well, I think if the... If I'm the wholesale and selling drugs to people and I know that they're going to go sell them to somebody else, I know that. Any darn fool knows that. I know it, period. What else would they do with them? With... Okay? Okay. I think the law is that I'm not in conspiracy with those dealers. I'm just making a sale. I don't care if they flush them down the toilet. I know what they're going to do with them, but I don't care what they do with them. As a general proposition of law, I accept that. And I would also point out to the court that, you know, the jury was instructed on a multiple conspiracy instruction basically because that was the theory of the defense, as Your Honor has just articulated. And the jury rejected that, and there was certainly sufficient evidence to support that. Because as Your Honor pointed out, the front thing is key. The front thing is key because the Riascos organization isn't getting paid unless the Mexican recipient can turn those drugs into money. And the evidence before the jury was that the only way the Mexican organization could turn a quantity this large into money was to import it and distribute it in the United States. Therefore, the success of the overall venture is dependent upon both the importation and the distribution. That's enough for a sufficient case. So what's the evidence of fronting? I mean, fronting, I understand, is a generic term, but it doesn't always mean the same thing. So what's the evidence of fronting here? Agent Carpio testified specifically at pages 826 and 827 of the transcript that the Riascos organization in this transaction was not going to get paid until the Beltran organization sold them. The Riascos organization was selling the drugs on credit to the Mexican organization. That testimony is in the record. So ‑‑ It's a little bit flaky in the record, though, isn't it? It's not exactly clear whether he was testifying as an expert at that point or whether he was actually testifying to personal knowledge, is it? It was ‑‑ it is not clear. I would point out that it was brought out on direct examination and the defense didn't follow up on that. And, again, that is the state of the record. And based on that testimony, a rational jury could credit it. And that's what we're talking about here. We're talking about a legally sufficient case. And, again, in addition to the front ‑‑ so, you know, you have the testimony of the fronting. In addition to the direct testimony that there was fronting in this case, the expert Mandragal also testified that the Beltran organization in general received their drugs on credit. This is just how these organizations work. They have established relationships and the money comes on credit. That's the testimony. With respect to the issue of the admission of the expert testimony, there's a couple of issues that are sort of swirling around in this. One is the adequacy of the expert disclosures and the other is the actual content of the expert testimony. I should point out that the defense at trial never once objected that any of the expert testimony went too far. The trial judge had granted their motion to eliminate, to the extent that they were asking the experts to exclude any testimony that violated Rule 704B that went to the ultimate issue of the defendant's mental state, granted that motion. And at trial, the defense never argues that any of the defendant's experts went too far. So the government's position is that their arguments on appeal are completely unpreserved. But on the merits, they fail. Because if you read the experts, Wilson testified he had never heard of the Riascus organization. He simply testified as to the general operations of how Colombian operations work, how cocaine is manufactured, the general transportation routes used by those groups when they sell drugs to Europe and when they sell drugs along the Pacific coast where they're going to Mexico and then on to the United States. Never talked about the Riascus, period. The same is true for Agent Wasser, who simply testified about the routes used by Colombian organizations, never just testifying about anything that these individual defendants did. And he plotted three coordinates on a map. The jury was left to infer the import of those coordinates, but he never testified that the drugs at issue in this case were going anywhere. That was an inference the jury had to draw. And that's a perfectly acceptable use of expert testimony. And the final expert was Agent Mondragal, who testified about the inner workings of the Beltran organization and specifically how they, when they, well, first of all, the Beltrans don't do any business in Europe. And while they do do some business in Mexico, not this large a quantity. When the Beltrans get this large a quantity, it's going into the United States. That's their business. That's how they make money. Tell me what links we have in the testimony between these defendants and the Beltran group. In the testimony, there is none. I mean, there's no direct evidence linking this organization to the Beltran group. The actual recipient of, the Mexican recipient, was never discussed. We have the facts. We know factually that Mr. Zapata provided the coordinates for the offload point off of Puerto Madero, which was a port in Beltran controlled area of Mexico. So that's how you know the Beltrans are getting it, because it's in an area that's controlled by the Beltrans. The Mexican drug trafficking organizations have divvied up the country, and they're very territorial. So just from the location of where the drugs are going to be offloaded, the jury can draw the inference that the Beltrans are going to be the recipient. But there was no testimony directly linking any of the defendants to knowledge that the Beltrans were going to be the recipient. I think that's sort of the point of Carpio's testimony. I mean, everyone's harping on Carpio's testimony, but it wasn't admitted for its truth. The jury was instructed repeatedly that this was not admissible for its truth. It was not evidence of any of the crime and evidence of substantive evidence against any of the defendants. It was offered for a limited purpose and a limited purpose only. And that purpose was? The limited purpose was to rebut the defense attack on the adequacy of the investigation. And Mr. Jimenez's attorney opened the door wide to that. He specifically asked Agent Carpio after his post-arrest statement had been excluded on Miranda grounds, isn't it true that you never bothered to figure out who the organization was? And the agent, to his credit, complied with the ruling and said no. Now, that was completely misleading because, in point of fact, he had tried and found out who the recipient was. So simply because, you know, the defense had created a misimpression about the nature of the investigation, if Your Honor is looking for the testimony, it's on page 726 of the transcript, is that exchange. The district court acted well in its discretion to allow, you know, Carpio simply to testify. The reason I'm looking at this is you really didn't quite characterize properly the question to Captain Carpio by the defendants. You said you never bothered. The follow-up question that he's leaving that presence, he asked the question, which is you never identified him, and he said no. And then the defense says you never even bothered to try. I got it. There it is. You didn't bother to look, right? Right. Can you ask that again? Yes, you didn't try to follow the money. No, sir, to the best of our abilities, we couldn't do it, sir. Right, but the idea – I didn't say I didn't bother. No, to the best of our abilities. Well, he doesn't say you didn't bother, but the defense says you didn't bother. Well, but that's the question. It's a nasty, leading question, and he doesn't say I didn't bother. He says to the best of our abilities, I couldn't. So, I mean – I think my point is it's not the answer. It's the question that opens the door. It's because you're trying – the jury is – the defense is trying to create the impression that they didn't know. I think they did open the door, but it's – you know, it's – I mean, a lot of this is games playing, and to say to the jury don't consider that for the truth of the matter is like saying don't think of a camel. Well, try not thinking of a camel after what I just told you. Your Honor, I certainly accept that point, but the reality is that we rely on these limiting instructions all the time, and that is how trials are conducted. And I think counsel actually used a term phrase that I think actually aptly describes why this really didn't matter. This was, in effect, simply the cherry on the sundae. By the time this rebuttal testimony – I don't think he used it in quite the formal way that you're using it. I don't think he did either. But the point is that by the time this testimony comes out, the jury has heard all the circumstantial evidence that will allow them to draw this inference. This testimony, even if it had been an evidence for its truth, which it wasn't, simply would have just connected the dot that the jury themselves easily could have connected. So when we're talking about the impact of this testimony and whether the jury could put it out of their mind, I'm not so sure they couldn't. And I think it's also important to recognize that all Carpio said was that he had identified – he had managed to identify the Beltran organization. Didn't say how he learned that. Didn't say he learned it from any of the defendants. So the jury was essentially presented – could easily have drawn the inference that, well, he learned it the same way we're learning it, that it went to an area of Mexico controlled by the Beltrans, and he figured it out. So if – on the state of the record, it's not even clear that the jury would draw this damning inference from this testimony, that the defense posits would have made the limiting instruction completely inept. I don't want to belabor the point too far, but I think the government could have rehabilitated Mr. Carpio on the question as to whether or not they'd done a proper investigation by saying, well, did you in fact investigate? Yes. Did you in fact discover? Yes. Yes. But I'm not permitted to tell you who. And that would have accomplished the purpose the government says it's trying to accomplish. That's true, and I suppose if the defense had posited that, maybe the district judge would have used that as an option, but it wasn't posited by the defense. The defense's position was that they just shouldn't hear it and that the jury should just be misled about the nature of the investigation. I guess I should turn briefly to some of the other issues that have been raised. One is the issue of the severance, which turns on Carpio's testimony. And again, at this point, while I take Mr. Zapata's point that it wasn't his attorney that opened the door here, again, to be entitled to the severance mid-trial at this stage, the judge would have had to have been firmly convinced that there was just no possible way the jury could disregard this testimony. And disregard two aspects of the limiting instruction. One, not only that you can't use it against any of the defendants, and two, that it's not admissible for its truth in any event. And I should point out that the defense's arguments in the reply notwithstanding, there was not a complaint at all about the adequacy of the limiting instruction or the limiting instruction's efficacy. So again, we're talking about an unobjected to instruction that was, in the government's view, plainly adequate to accomplish its purposes. With respect to the 410 argument, the government would simply just point out that Mr. Villescaz's argument is foreclosed by the language of the rule. These were proper statements that resulted in a guilty plea, and the rule only applies if the proper statements don't result in a guilty plea or a plea that's withdrawn. So by the plain terms of the rule, that argument has to fail. With respect to Mr. Zapata's statements as to being voluntary, well, the district court found, as a matter of fact, that Mr. Jimenez's statements were not motivated by his desire to take the agent up on his offer to relocate his family to the United States. And on this record, that's a factual finding that is not clearly erroneous. I mean, perhaps the strongest evidence that these promises weren't coercive was the fact that Mr. Jimenez ultimately rejected them and ultimately decided not to cooperate and decided to resist extradition. So if these promises of simply just a bona fide offer that if you're willing to cooperate, we'll protect you from this organization, we'll bring your family to the United States, if that was so coercive, one would have expected Mr. Jimenez to cooperate, which he didn't do. And finally, with respect to Mr. Riasco's argument about supervised release, I would simply just point out that supervised release is triggered upon release from imprisonment. It has nothing to do with the adequacy of the notice. The notice issue simply goes to whether or not you can be revoked. So that's just a non-issue. I think I've hit everything, unless the Court has some questions on something I've missed. Thank you. Now, you've come to the end of your time. Why don't we put three minutes on the clock and then see. We're not going to cut you off, so say what you need to say. Thank you, Your Honor. Efficiently, but say what you need to say. The best I can, I'll avoid food metaphors. I am glad that the United States has conceded that there was no direct evidence that the Beltrans were the co-conspirators in this case. That is contrary, however, to the position they took at trial and even in their brief when they identified them as the co-conspirators and the co-schemers. And that gets to the flaw of where we are now. But there's a difference between saying there's not direct evidence and identifying them as co-schemers. There can be indirect evidence that does that. Of course. And I didn't mean to suggest the contrary. But that evidence came from the testimony of the experts with the flaws that we have talked about. And with respect to Agent Carpio, the Court is correct that it was kind of a weak read and also I would add that Carpio's testimony seems to be in the category that this Court has expressed concern about, both as the case agent and as the expert, the dual role. It's not even clear, and yet this is the passage that the Court puts the greatest weight on. I also think that, Your Honor, Judge Fernandez has raised a perceptive point about what really did these people intend and did they foresee that they would be part of this conspiracy. And the best illustration of that is that these gentlemen were convicted of conspiracy to distribute within the United States when there's absolutely no evidence of any intent to distribute other than what we might call the size of the drugs and the evidence that has been described about fronting. Now, to talk about fronting very briefly, the case didn't involve the kind of fronting evidence that this Court examined. For example, in the Minkoff case that Your Honor, Judge Rawlinson authored, where they were talking about really known parties, a supplier and a dealer, and what the relationship was in concrete transactions that could be clearly analyzed. So I think that this point that Your Honor has raised illustrates the basic flaw in the government's case. They didn't have direct evidence to support their case. Finally, on the issue of severance, to underscore, we have already said that Mr. Zapata did not raise that. But to add to the prejudice as to why a severance was needed, it's clear he could not have asked about this post-arrest custodial statement because of Miranda. But in the statement itself, when one looks at it, it's clear that Jimenez talked about having talked to Jose Riascos, who was deceased and not here. A cross-examiner may well have wanted to bring out, well, the information you got did not mention Mr. Zapata. But because of the Court's ruling, which made it very clear, and the Court was trying to do the right thing, that he didn't want anybody to go there in his language, Zapata was hamstrung, so he couldn't cross-examine. Evidence came in that was poisonous, we believe, given the context of this case and the absence of direct evidence that the Beltrans were the co-conspirators. It actually came in to relate to a different issue, the money laundering account, which my client was not charged in. And then he's not able to cross-examine on the source of that. Thank you, Your Honor. I don't know if my colleague – looks like there's a few seconds. Okay. Thank all of you for your very helpful arguments. The United States v. Jimenez, Riascos, and Zapata now submitted for decision. That completes our argument for this morning, and we're now adjourned. All rise.
judges: Fernandez, Fletcher, Rawlinson